UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

               Plaintiff,                       Case Number 16-20519

v.                                           Honorable David M. Lawson

RONALD MERLE SANTMIRE,

               Defendant.

_____/

**ORDER DENYING MOTION FOR COMPASSIONATE RELEASE**

Defendant Ronald Santmire has filed a motion asking the Court to reduce his sentence to time served under the authority of the compassionate release provision of 18 U.S.C. 3582(c)(1)(A)(i), as amended by section 603(b)(1) of the First Step Act of 2018, Pub L. 115-391, 132 Stat. 5194, 5239. Santmire has served about 50 months of a 235-month prison sentence for transportation of child pornography. He argues that a sentence reduction is justified by his health conditions coupled with the threat of re-infection with the novel coronavirus (he previously tested positive and exhibited symptoms) in the congregant confinement of a prison setting. The government contends that Santmire has not shown extraordinary and compelling reasons for release, and it maintains that Santmire would be a threat to public safety if released. Santmire's evidence of extraordinary and compelling reasons presents a close case for release. But consideration of the factors in 18 U.S.C. § 3553(a) tip the scale decidedly against release. Because Santmire has not demonstrated that immediate release is appropriate or that he qualifies for release under any other provision of section 3582(c)(1), the motion will be denied.

I.

After attempting to enter the United States from Canada with an eleven-year-old boy on July 3, 2016, federal authorities learned that Defendant Ronald Merle Santmire had a significant

history of sexually abusing young boys.  Evidence found in his house pertaining to his exploitation spanned decades.  Almost a dozen boys provided information in the federal investigation that related to Santmire's sexual interest and activities with boys aged six to sixteen.  The details of his abuse are spelled out in the government's sentencing memorandum.  ECF No. 34.

Santmire was charged with transportation of a minor with intent to engage in criminal sexual activity, transportation of child pornography, and possession of child pornography.  He pleaded guilty to transportation of child pornography on October 25, 2016.  Because Santmire had been convicted of receiving child pornography in 1986, he faced a mandatory minimum sentence of 15 years.  18 U.S.C. § 2252A(b)(1).  On February 22, 2017, the Court sentenced him to 235 months (19 years, seven months) in prison followed by five years of supervised release and recommended that he be designated to a facility with mental and physical health services.

Santmire is currently incarcerated at FCI Elkton, a low-security prison in Ohio.  According to the Bureau of Prison's (BOP) website, his projected release date is March 15, 2033.  Santmire served about 50 months of his prison sentence.

On May 23, 2020, Santmire submitted a request to the warden of FCI Elkton seeking compassionate release due to the health risks posed by the coronavirus pandemic.  He never received a response.

He then filed a *pro se* motion for compassionate release on July 2, 2020.  The Court appointed counsel, who filed a reply to the government's response.  Counsel also filed a supplemental motion for compassionate release on August 28, 2020.  The government responded on September 11, 2020, and the defendant replied on September 16.

Santmire is 62 years old and suffers from sleep apnea, hypertension (high blood pressure), hyperlipidemia (elevated cholesterol), depression, spinal stenosis, degenerative disc disease,

recurrent bouts of cellulitis, unspecified vein disorder, glaucoma, obesity, and other conditions. He also has hearing and vision problems, is confined to a wheelchair, and is a former smoker.  His medical records further indicate that he is obese with a body mass index of 38 to 39.

The defendant began exhibiting symptoms of COVID-19 around in late April 2020: he had a fever of 101.4, was coughing, had "some shortness of breath," and felt "generally weak."  The BOP tested him for the virus about a month later, on May 21, the results of which came back positive on May 23.  The BOP considered him asymptomatic and placed him in isolation the following day.  He tested positive again on July 4 and July 10.  He apparently recovered later that month and tested negative on July 24.  The BOP never hospitalized Santmire for the condition, but it did prescribe him an inhaler, acetaminophen, and doxycycline hyclate (an antibiotic).  He was scheduled to take another test, but the BOP cancelled it because the CDC revised its guidelines to suggest that further testing was not necessary.

FCI Elton, where Santmire is confined now, currently houses 2,045 inmates, one of whom has an active case of COVID-19.  *COVID-19*, Bureau of Prisons (Sept. 23, 2020), https://www.bop.gov/coronavirus/.  Two staff members have active cases reported.  *Ibid.*  To date, 951 other inmates and 52 other staff members contracted COVID-19 and recovered.  *Ibid.* Nine inmates have died.

Santmire has maintained a clear disciplinary record in prison, and the BOP deemed him a "minimum" recidivism risk.  Santmire says that if released, he intends to live with his niece, Dena Gay, who has been living in his home in Findlay, Ohio, since his incarceration.

As noted above, Santmire was convicted previously of receiving child pornography through the mail in 1986.  His conviction was affirmed on appeal. *United States v.  Santmire*, 861 F.2d 722 (6th Cir. 1988) (table).

II.

As a general rule, "a federal court 'may not modify a term of imprisonment once it has been imposed.'" *United States v. Alam*, 960 F.3d 831, 832 (6th Cir. 2020) (quoting 18 U.S.C. § 3582(c)). "But that rule comes with a few exceptions, one of which permits compassionate release." *Ibid.* "The request may come through a motion in federal court filed by the Director of the Bureau of Prisons. 18 U.S.C. § 3582(c)(1)(A). Or it may come through a motion filed by the inmate after he has 'fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the [prisoner]'s behalf' or after 'the lapse of 30 days from the receipt of such a request by the warden of the [prisoner]'s facility, whichever is earlier.'" *Ibid.* (quoting 18 U.S.C. § 3582(c)(1)(A)).

Upon a proper motion via either avenue, the Court may, "[a]fter 'considering the factors set forth in section 3553(a) . . . reduce the prisoner's sentence if it finds that 'extraordinary and compelling reasons warrant such a reduction' or if the '[prisoner] is at least 70 years of age,' has 'served at least 30 years,' and meets certain other conditions." *Ibid.* (quoting 18 U.S.C. § 3582(c)(1)(A)(i), (ii)). Santmire relies on subparagraph (i) of the statute. Under that provision, the Court can order a reduction of a sentence, even to time served, *first*, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," *second*, if "extraordinary and compelling reasons warrant such a reduction," and *third*, if the "reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). The Sentencing Commission's policy statement is found in U.S.S.G. § 1B1.13, which simply recites the statute. The commentary adds gloss, which does not have the force of law. *United States v. Havis*, 927 F.3d 382, 386 (6th Cir.), *reconsideration denied,* 929 F.3d 317

(6th Cir. 2019) (en banc) (holding that the "commentary has no independent legal force — it serves only to *interpret* the Guidelines' text, not to replace or modify it").

A.

Addressing the second element — extraordinary and compelling reasons — Santmire points to the conditions of his physical health. He contends that the coronavirus pandemic, in combination with his obesity, sleep apnea, hypertension, hyperlipidemia, depression, age, and status as a former smoker, provides the extraordinary and compelling reason for his release.

The defendant's generalized concerns about the health risks from his incarceration are justifiable. "The COVID-19 virus is highly infectious and can be transmitted easily from person to person. COVID-19 fatality rates increase with age and underlying health conditions such as cardiovascular disease, respiratory disease, diabetes, and immune compromise. If contracted, COVID-19 can cause severe complications and death. Because there is no current vaccine, the Centers for Disease Control and Prevention ("CDC") recommends preventative measures to decrease transmission such as physical distancing, mask wearing, and increasing focus on personal hygiene such as additional hand washing." *Wilson v. Williams*, 961 F.3d 829, 833 (6th Cir. 2020). "The COVID-19 pandemic is extraordinary and unprecedented in modern times in this nation. It presents a clear and present danger to free society for reasons that need no elaboration." *United States v. Ortiz*, No. 16-439, 2020 WL 3640582, at *2 (S.D.N.Y. July 6, 2020).

Moreover, "the crowded nature of federal detention centers presents an outsize risk that the COVID-19 contagion, once it gains entry, will spread. And, realistically, a high-risk inmate who contracts the virus while in prison will face challenges in caring for himself. For these reasons, in the past months, numerous [federal] courts . . . have ordered the temporary release of inmates held in pretrial or presentencing custody and, in more limited instances, the compassionate release of

- 5 -

high-risk inmates serving federal sentences." *Ortiz*, 2020 WL 3640582, at *2 (collecting cases; footnotes omitted).

It is widely recognized and publicly acknowledged that persons with certain medical conditions face an increased risk of severe consequences from potential COVID-19 infection. *United States v. Lassister*, No. 17-232, 2020 WL 3639988, at *4 (D. Md. July 6, 2020) ("The risk factors include age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system.") (citing *Coronavirus Disease 2019 (COVID-19), People Who Are At Risk for Severe Illness*, Ctrs. for Disease Control and Prevention (June 25, 2020), https://bit.ly/2WBcB16).

The government does not dispute the existence or severity of the defendant's medical conditions.  At age 62, the defendant is near the high-risk age of 65 and is obese, with a BMI that ranges between 38 and 39.  The defendant also is hypertensive and a former smoker.  *People with Certain Medical Conditions*, *supra* (recognizing that "[b]eing a former cigarette smoker may increase [the] risk of severe illness from COVID-19").  And although the CDC indicates that individuals with hypertension "*might* be at an increased risk for severe illness from COVID-19," the risk increases when "that condition is grouped with 'serious heart conditions' that predispose a person to higher risks of complications.  Also included are 'heart failure, coronary artery disease, congenital heart disease, cardiomyopathies, and pulmonary hypertension.'" *United States v. Watkins*, 2020 WL 5035111, at *4 (E.D. Mich. Aug. 11, 2020) (quoting *People with Certain Medical Conditions*, *supra*).  Here, the defendant's hypertension is not only accompanied by his obesity, but he also suffers from hyperlipidemia.  *People with Certain Medical Conditions*, *supra* ("The more underlying medical conditions someone has, the greater their risk is for severe illness from COVID-19").

The CDC does not recognize the defendant's other ailments — sleep apnea, depression, spinal stenosis, degenerative disc disease, cellulitis, unspecified vein disorder, and glaucoma — as conditions that may increase the severity of a potential COVID-19 infection. *People with Certain Medical Conditions*, *supra*.

There is no question that the defendant, according to the CDC's guidelines, is at a high risk of severe COVID-19-related complications. But the defendant has already contracted and recovered from the virus. There is no clear answer to whether the possibility of reinfection constitutes an extraordinary and compelling reason for his compassionate release. Judges in this district have gone both ways on the issue, but this Court has addressed the question twice now, concluding both times that the possibility of reinfection did not constitute an extraordinary and compelling reason for release. *United States v. Buford*, No. 05-80955, 2020 WL 4040705, at *5-6 (E.D. Mich. July 17, 2020); *United States v. Fuqua*, No. 13-20066 (E.D. Mich. September 22, 2020); *but see United States v. Backstrom*, No. 13-20597, 2020 WL 4596820, at *3 (E.D. Mich. Aug. 25, 2020) (granting compassionate release for individual who tested positive for COVID-19, but held at Terminal Island, "one of the worst affected [prisons] in the country"). However, the Court arrived at its conclusion in part because the defendants in *Buford* and *Fuqua* were asymptomatic. The BOP characterized Santmire's reaction as asymptomatic, but that plainly mischaracterized his condition, as he had a fever, weakness, and shortness of breath.

The government's position that the defendant's risk is mitigated due to prospective immunity from his past infection is at best questionable, and the most recent guidance from the CDC indicates that the scientific evidence presently available does not support a conclusion that persons infected with COVID-19 are immune from further disease after recovery. *See Updated Isolation Guidance*, Ctrs. for Disease Control and Prevention (Aug. 14, 2020)

https://www.cdc.gov/media/releases/2020/s0814-updated-isolation-guidance.html ("Contrary to media reporting today, this science does not imply a person is immune to reinfection with SARS-CoV-2, the virus that causes COVID-19, in the 3 months following infection. The latest data simply suggests that retesting someone in the 3 months following initial infection is not necessary unless that person is exhibiting the symptoms of COVID-19 and the symptoms cannot be associated with another illness."); *Clinical Questions about COVID-19*, Ctrs. for Disease Control and Prevention (Aug. 4, 2020) https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html ("There is no firm evidence that the antibodies that develop in response to SARS-CoV-2 infection are protective. If these antibodies are protective, it's not known what antibody levels are needed to protect against reinfection.").

Instead, the most recently available guidance advises only that the science demonstrates that the period of infectiousness ends within 10 days after the onset of symptoms or within 20 days for those who become severely ill, and, thus, the fact that a person has tested positive for the virus does not warrant repeated testing or continued isolation after those presumptive infectious periods have expired. *See Study Confirms It's Possible to Catch COVID Twice*, Web MD (Aug. 23, 2020) https://wb.md/33MOU8y.

The defendant cited two instances where prisoners (Adrian Solarzano at Terminal Island and Gerald Porter at FMC Lexington) who had "recovered" from the virus had died from COVID-19-related complications shortly thereafter. Reply, ECF No. 50, PageID.1150-51; *see Buford*, 2020 WL 4040705, at *6 (describing the Solarzano incident as "anecdotal at best"). The defendant also cited an incident in which an inmate (Robert Hague-Rogers at FMC Fort Worth) died from COVID-19 complications after testing negative for the virus but positive for the antibody test, which indicated that he had the virus previously. *Id.* at PageID.1151.

Here, Santmire suffered from symptoms of the virus in late April 2020, including a fever, coughing, shortness of breath, and feeling "generally weak."  He tested positive for COVID-19 on May 23, July 4, and July 10.  The defendant was never hospitalized for the condition, and the BOP — remarkably — repeatedly considered him "asymptomatic."  Santmire tested negative on July 24, a factor that has led other courts to discount a claim of extraordinary and compelling reasons to shorten a sentence.  *See United States v. Bland*, No. 18-20555 (E.D. Mich. May 28, 2020) (denying compassionate release to an inmate who "tested positive for COVID-19 . . . experienced mild symptoms, recovered, and was released back to his unit").

However, even more remarkably, the BOP refuses to retest the defendant.  This is problematic considering that the defendant alleges that "he went to medical on August 16 because he was not feeling well.  He had a temperature of 99.8 degrees and his blood pressure was elevated.  Despite having had COVID-19 recently, the nurse told him that the facility would not retest him for the disease and that he would not be put in isolation."  Supp. Mot. Compassionate Release, ECF No. 52, PageID.1306.  This feature contrasts with the defendants in *Buford* and *Fuqua*, who were asymptomatic.

Another pertinent consideration, however, is the low probability that the defendant may be exposed to the coronavirus in his present situation.  Recent reports indicate that the rate of infection at Elkton, although previously alarmingly high, has declined significantly, with the prison now having ono active case among inmates and only two among staff.  *COVID-19*, Bureau of Prisons (Sept. 23, 2020), https://www.bop.gov/coronavirus/.

The government's position that the defendant is at little or no risk is less reassuring, considering the BOP's admitted failure to implement any comprehensive prophylactic testing program, which calls into doubt the figures that it has reported.  *Wilson*, 961 F.3d at 849 ("The

flaws inherent in the half-measures employed by the BOP are amplified by the BOP's inability to test inmates for COVID-19. At the time of the preliminary injunction, the BOP had only obtained 75 tests for roughly 2,500 inmates at Elkton. The fact that more than two-thirds of those tests came back positive suggests an extremely high infection rate, but the BOP's testing shortage ensured that the record would not reflect the precise figure.") (Cole, Chief J., concurring); *see also United States v. Campbell*, No. 03-4020, 2020 WL 3491569, at *9 (N.D. Iowa June 26, 2020) ("As of June 23, 2020, no cases of COVID-19 at Yankton FPC had been reported. However, without knowing whether the BOP is actively testing inmates and staff members for COVID-19 at Yankton FPC, the lack of active confirmed cases does not mean COVID-19 is not present at the facility. Nor does it mean there will not be a future outbreak at the facility. As the Government acknowledges, despite extensive measures to prevent transmission, more federal inmates will inevitably contract COVID-19 going forward.").  Nevertheless, the most recent reports suggest that the defendant's risk of infection now is as low as it would be in a home setting, considering that the measures taken by the BOP appear to have succeeded in halting the spread of the disease, despite the recent acceleration of the pandemic among the public at large, including in Ohio, where recent daily case counts are trending at consistently high levels (between 700 to 1,300 cases per day).  *See Ohio Covid Map and Case Count*, N.Y. Times, https://nyti.ms/3iYpOtK (last visited Sept. 23, 2020).

However, the defendant's poor health, the uncertainty about whether an individual may contract the virus again, and the fact that the defendant alleges to have experienced symptoms nearly one month after testing negative all support the conclusion that Santmire has met the extraordinary-and-compelling-circumstances threshold for compassionate release.

B.

The government also argues that compliance with the Sentencing Commission's policy statement is mandatory, and points to one line in section 1B1.13 that requires the prisoner to prove lack of dangerousness. But that requirement is a condition of 3582(c)(1)(A)(ii). Santmire has invoked section 3582(c)(1)(A)(i), which contains no such requirement.

That is not to say that dangerousness is irrelevant. It is a factor incorporated in section 3551(a), which must be "consider[ed]" before release for extraordinary and compelling reasons may be allowed. *See* 18 U.S.C. § 3553(a)(2)(C) (requiring a sentencing court to consider "the need … to protect the public from further crimes of the defendant"). And any sentence reduction also must account for "the seriousness of the offense," the need "to promote respect for the law," and "afford adequate deterrence to criminal conduct." *Id.* § (2)(A), (C). These factors are to be considered together with the prisoner's circumstances to arrive at a conclusion that they are sufficiently extraordinary and compelling to justify a sentence reduction.

Santmire's crime undoubtedly was serious. According to the information furnished at sentencing, his actions victimized dozens of children in potentially life-altering ways. And although he has behaved well in prison, he has not yet taken any classes or programs to address his sexual interest in children, which has endured for decades. And the defendant's medical condition does not diminish the possibility that he would reoffend; he was convicted of transporting child pornography, which does not require any sort of physical prowess. He needs only a computer with internet access to resume his exploitative activities. Santmire requests that he to be returned to the house where he lived before his arrest — the same house where he hosted numerous young boys, grooming them for sexual abuse.

- 11 -

The defendant maintains that he poses little danger to the community because the BOP determined that his recidivism risk is minimal and that "whatever risk remains can be managed through the terms of supervision and password-protecting any internet connected devices at his proposed release address." Supp. Mot. Compassionate Release, ECF No. 52, PageID.1307. He also alleges that he can participate in sex offender treatment as soon as it is safe to do so. He insists that he has found faith and knows that he would benefit from counseling, requesting that the Court require him to attend sex offender counseling as a condition of release. Finally, he argues that the sentencing guideline range in this case (and, perhaps, in all child pornography cases) is a poor indicator of society's sense of what sentence [he] deserved." He cites *United States v. Collins*, 828 F.3d 386, 388 (6th Cir. 2016), where the court observed that the defendant's guideline range was 262 to 327 months, but after trial, the district court judge polled the jurors about what they believed the appropriate sentence was, to which they responded 0 to 60 months with a mean of 14.5 months and median of 8 months. Moreover, in 2018, the average sentence for federal defendants convicted of murder was 291 months. *See* U.S.S.C., Fiscal Year 2018: Overview of Federal Criminal Cases at 9 (June 2019)).

Those arguments are interesting but irrelevant here. Santmire is a repeat offender, and his conduct with young boys was predatory. Congress has imposed mandatory and severe punishments for two-time child pornography offenders, deeming them a danger to the community. The Court imposed a sentence above the mandatory minimum of 15 years because it determined, among other things, that the protection of society required it. Cancelling that prison term now, with less that a quarter of the time served, would undercut that determination and undermine respect for the law, which is another factor that must be considered. 18 U.S.C. § 3553(a)(2)(A).

Comparing the sentences in murder cases to child pornography cases does not help the defendant's cause.  Certainly, a murder ends a life, but crimes against children cause potentially life-long damage.  Moreover, the defendant's claims that he found faith, regrets his actions, and seeks to reform himself should be taken with a grain of salt.  At his sentencing hearing, Santmire took his allocution opportunity to deny the allegations and attack the victim's mother, stating: "I do not know what they are talking about, a victim being your son . . . You told me once the only reason that you let your son stay with me for four months is because the drug problems at your house involving your . . . live-in boyfriend. I have never hurt that child, ever in my life.  I was good to him. . . . I'm sorry I looked at [the pornographic photo] one time and deleted it. I thought it was gone."  Sentencing Hr'g Tr., ECF No. 40, PageID.194.

The defendant is a hands-on offender and has exploited children since at least the 1980s. Despite the defendant's demonstration of an extraordinary and compelling reason for his release, the section 3553(a) factors do not favor a reduction of his sentence to time served.

III.

Santmire has exhausted his administrative remedies, but he has not demonstrated that compassionate release under 18 U.S.C. 3582(c)(1)(A)(i) is justified.

Accordingly, it is **ORDERED** that the defendant's motion for compassionate release (ECF No. 37) is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   September 24, 2020